IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-85-FL

| | | |
|---|---|---|
| ELIZABETH A. WIGGINS, | ) | |
| | ) | |
| Plaintiff/Claimant, | ) | |
| | ) | |
| | ) | **MEMORANDUM AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-65, DE-72] pursuant to Fed. R. Civ. P. 12(c). Claimant Elizabeth A. Wiggins ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her applications for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication  Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this court recommends denying Claimant's Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings and upholding the final decision of the Commissioner.

**STATEMENT OF THE CASE**

Claimant protectively filed an application for a period of disability, DIB and SSI on 13 February 2008, alleging disability beginning 1 August 2003. (R. 10). Both claims were denied initially and upon reconsideration. *Id.* A hearing before the Administrative Law Judge ("ALJ") was held on 1 February 2010, at which Claimant was represented by counsel and a witness and a

vocational expert ("VE") appeared and testified. (R. 10, 27). On 23 March 2010, the ALJ issued a decision denying Claimant's request for benefits. (R. 7-25). On 4 January 2011, the Appeals Council denied Claimant's request for review. (R. 1-5). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails

at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65

F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of

the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other

work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with

the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This

regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of

functional limitation resulting from a claimant's mental impairment(s): activities of daily living;

social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§

404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision

pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(2),

416.920a(e)(2).

In this case, Claimant alleges the following errors by the ALJ: (1) improper evaluation of a

treating physician's opinion; (2) failure to classify Claimant's bipolar disorder and mental retardation

as severe impairments; (3) failure to find Claimant's impairments met Listing 12.05C; (4) improper

3

assessment of Claimant's credibility; and (5) improper assessment of Claimant's residual functional capacity ("RFC"). Pl.'s Mem. Supp. Mot. J. Pleadings ("Pl.'s Mem.") at 1, 13, 15, 17, 20. The court observes further that Claimant has submitted evidence not previously presented to the ALJ or Appeals Council. [DE-66.1]. While Claimant has not requested that the new evidence be incorporated into the record and considered by the ALJ on remand pursuant to sentence six of 42 U.S.C. § 405(g), the court nevertheless considers whether a sentence six remand is appropriate.

## FACTUAL HISTORY

### I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 12). Next, the ALJ determined Claimant had the following severe impairments: depression, anxiety, panic attacks and attention deficit disorder ("ADD"). (R. 13). However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate limitations in her activities of daily living, social functioning and concentration, persistence and pace with no episodes of decompensation. (R. 16).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform a full range of work at all exertional levels involving simple, routine and repetitive tasks. (R. 17). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 18). At step four, the ALJ concluded Claimant did not have the RFC to

4

perform the requirements of her past relevant work. (R. 19). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 20).

## II.    Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 38 years old and unemployed. (R. 46). Claimant is a high school graduate and received vocational training as a security guard. (R. 36-37, 42). Claimant testified to enrollment in special education courses, including reading and mathematics, throughout her education. (R. 37). Claimant's past work experience includes working for various businesses as a security guard. (R. 42).

Claimant explained numerous medical conditions support her disability claim and her inability to work full-time. These medical conditions include anxiety, depression, back pain and migraine headaches (R. 49, 53, 59). Regarding her mental impairments, Claimant visits her treating physician between every four and eight weeks for management of her medications and undergoes counseling sessions at least every other week and sometimes on a weekly basis. (R. 50, 52, 54). Claimant testified that her depression and anxiety medications, Abilify and Buspar, are ineffective at controlling her symptoms associated therewith. (R. 53).

Claimant testified to experiencing low back pain for the last seven to eight years. (R. 59). Claimant stated that her back pain was an 8 on a zero to ten numeric pain scale without medication and a 5 with medication. (R. 60). Claimant has not undergone any treatment for her back pain; however, her family physician has prescribed two medications – an unnamed medication and Ibuprofen. (R. 59-60). Claimant testified that only Ibuprofen offers some relief. (R. 60). Claimant

5

has experienced migraines "about ever other day" lasting for a "couple hours" for the past two years. (R. 60-61). Claimant testified that she has never sought regular medical treatment for her migraines; however, she has visited the emergency room on occasion. (R. 61-62). When she is experiencing a migraine, Claimant must lie down in complete darkness. (R. 61).

Claimant testified that side effects associated with her medications include drowsiness, dry mouth and restlessness. (R. 64). Claimant testified that she has a fear of medication as a previously prescribed medication, Lithium, damaged her thyroid. (R. 49, 53). As a result, Claimant opined that she now suffers from a "thyroid condition" for which she also takes medication. (R. 64).

Claimant's daily activities include caring for her five year old daughter and four year old son, both of whom are autistic (R. 56, 69), preparing meals for her family, washing laundry and grocery shopping. (R. 57-58). However, Claimant explained completing her household chores is a struggle and can take many hours because her mind "wanders." (R. 57). Claimant testified further to experiencing concentration difficulties which cause forgetfulness. Claimant relies on the assistance of three case workers, who assist Claimant with errands and take her to appointments, as Claimant does not have a drivers license. (R. 54). Claimant initially testified that she can read "okay" but later clarified that she can understand a romance novel but not a newspaper. (R. 38). Claimant testified further that reading is difficult due to poor eye sight. (R. 38). Claimant can perform addition "somewhat" but cannot perform subtraction or make basic change. (R. 46, 58).

### III. Dion Shay Norfleet's Testimony at the Administrative Hearing

Dion Shay Norfleet, a licensed professional associate counsel and Claimant's case manager, also testified at the administrative hearing. (R. 74, 78). At the time of the hearing, Norfleet had been working with Claimant for three months. (R. 74). Norfleet testified that over the past three months,

6

Claimant had been suffering from depression and as a result, Norfleet had been assisting Claimant with coping strategies. (R. 78). Norfleet testified that Claimant has called her when she was upset but Claimant has never mentioned suicide. (R. 79). Norfleet confirmed Claimant's testimony that she performs her own household chores, has difficulty with her vision and maintaining concentration and loses track of what she is doing and is easily distracted. (R. 77, 79). Norfleet testified that employment opportunities have been discussed with Claimant but expressed that as a result of a cognitive disability, Claimant may have difficulty learning new tasks. (R. 80). Norfleet testified further that vocational rehabilitation has yet to determine whether Claimant is employable. (R. 81).

Norfleet testified to assisting Claimant with budgeting matters, appointments, scheduling of household chores and providing Claimant with the necessary services to adequately care for her children. (R. 74-76). Norfleet accompanies Claimant to her psychiatry appointments and ensures Claimant fills her medication prescriptions. (R. 75). Norfleet testified that with her encouragement, Claimant has maintained her personal hygiene and that of her children. (R. 75-76).

## IV.    Vocational Expert's Testimony at the Administrative Hearing

Julie Sawyer-Little testified as a VE at the administrative hearing. (R. 82-85). After the VE's testimony regarding Claimant's past work experience (R. 82), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed the following hypothetical questions. First, the ALJ asked whether the individual could perform Claimant's past relevant work assuming the individual had no exertional limitations, was limited to unskilled work, had "limited but satisfactory ability to communicate and to deal with coworkers and supervisors and would be limited to satisfactory ability to adapt to work stressors." (R. 82-83). The VE responded in the negative but explained the hypothetical individual could perform work as a

7

"cleaner-hospital" (DOT #323.687-010), store laborer (DOT #922.687-058) and washer (DOT #599.687-030), all of which require the ability to perform medium work. (R. 83). Second, the ALJ asked whether positions would be available if the hypothetical individual above was limited to light work. (R. 83). The VE responded the individual could perform work as a "cleaner-housekeeping" (DOT #323.687-014), cashier (DOT #211.462-010) and small products assembler (DOT # 706.684-022). Third, the ALJ asked if the hypothetical individual, now limited to light work, would be employable if further limited to being unable to handle or tolerate work stressors and required assistance in performing activities of daily life. (R. 84). The VE responded in the negative. *Id.* The VE stated that her testimony was consistent with the DOT. (R. 85).

## DISCUSSION

**I.    The ALJ did not err in evaluating the opinion of Claimant's treating physician.**

Claimant contends the ALJ should have accorded controlling weight to the opinion of Claimant's treating psychiatrist, Bernard T. Eaton, M.D. Pl.'s Mem. at 20. This court disagrees.

The ALJ must generally give more weight to the opinion of a treating physician because that doctor is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ

8

holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted); *Wireman v. Barnhart*, No. 2:05-CV-46, 2006 U.S. Dist. LEXIS 62868, at *23, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (stating an ALJ "may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings"); 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

When the ALJ does not give the opinion of a treating physician controlling weight, the ALJ must weigh the opinion pursuant to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship between the physician and the claimant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record and (5) whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). Moreover, the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by substantial evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." S.S.R. 96-2p, 1996 SSR LEXIS 9, at *12, 1996 WL 374188, at *5.

The medical opinion at issue appeared in a letter dated 23 April 2008 wherein Dr. Eaton with Easter Seals UCP -Area Services and Programs, Inc. ("ASAP") noted his office had initially evaluated Claimant on 30 March 2008 with a follow-up treatment on 23 April 2008 and explained support of Claimant's "efforts to gain disability" as follows:

9

Ms. Wiggins has a near life-long history of depression and anxiety against a backdrop of marginal social skill and near panic level social 'phobia.' She was on a disability program in New Jersey and has not managed to get the disability benefits established in NC. She has attempted gainful employment in the recent past but was not successful due to anxiety and feeling "antisocial." She translates "antisocial" as "just wanting to be by myself all the time and not having friends." She has had occasions where the anxiety reaches the point of paranoia with auditory hallucinations.

(R. 143).[1] The ALJ acknowledged the length, frequency, nature and extent of Claimant's treatment relationship with ASAP and its physicians and therapists, including Dr. Eaton, between February 2008 and December 2009 via multiple references to ASAP records. (R. 14-15, 18-19). However, the ALJ did not accord controlling weight to the April 2008 opinion for the following reasons: (1) Claimant had undergone limited treatment as of April 2008 and as a result, Claimant was the sole source of evidence regarding any limitations; (2) Claimant's medication noncompliance; and (3) Dr. Eaton's examinations of Claimant's mental status subsequent to the April 2008 opinion yielded consistently normal findings. (R. 19). Claimant describes the ALJ's rationale as "inappropriate," claiming there "is no evidence on record that Dr. Eaton's opinion of [Claimant's] capabilities ever changed, even as he observed her both on and off her medications."[2] Pl.'s Mem. at 20.

To the contrary, review of the evidence of record supports the ALJ's finding. First, as the ALJ noted, Claimant's counseling sessions and treatment at ASAP did not begin until February 2008. The diagnostic assessment by Mark J. Lester, M.D., dated 11 February 2008, indicated Claimant

---

[1] A duplicate of R. 143 appears at R. 597.

[2] Claimant contends further that "new and material evidence" in the form of a 8 February 2011 Medical Statement Concerning Depression with Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim ("Medical Statement") completed by Dr. Eaton "demonstrates that, without question, [Dr. Eaton's] opinion still has not changed." Pl.'s Mem. at 20. For reasons provided below, however, the February 2011 evidence is immaterial and thus has no bearing on the ALJ's treatment of Dr. Eaton's April 2008 opinion.

was anxious, which was attributed to the stress of dealing with two young children, reduced income and difficulty paying bills on time. (R. 14, 503, 508). Later that same month, Claimant began treatment with Lindsey McAdams-Perry, LCSW, who saw Claimant on eight occasions between 26 February 2008 and 23 April 2008. (R. 552-59, 581-83). During that time period, as noted by the ALJ, Claimant began having fewer panic attacks, owed in part to the approval of her son's disability claim which had a positive impact on the family's income. (R. 14, 557). The ALJ correctly observed also that the limitations described in Ms. Perry's March and April treatment notes were based solely on Claimant's subjective complaints. (R. 18).

Next, the record supports the ALJ's conclusion that Claimant did not comply with medical treatment. The ALJ correctly observed that "[p]rior evidence established the claimant able to work with medication and subsequent medical evidence of record reinforced that the claimant was not taking medications, even when prescribed for her." (R. 18). Regarding evidence predating Claimant's treatment at ASAP, the ALJ discussed Claimant's treatment at St. Francis Medical Center in 2002 and 2003 for bipolar disorder. The ALJ noted that during that time period, Claimant's lithium levels were "okay," she denied depression and racing, suicidal or homicidal ideation or psychosis, she took her sleep aid medication infrequently, experienced no medication side effects and spent her leisure time reading, watching television and making hook rugs. (R. 13, 433-35, 437). The ALJ noted further that in 2002, Claimant worked in airport security and in 2003, Claimant worked part-time raising money for her church. (R. 13, 433, 437). Claimant did not seek further treatment until 2006. As the ALJ noted, Claimant was seen in June 2006 as a new patient at Wake Health Services, Inc. ("Wake Health"), for headaches and was described as well appearing and very talkative. (R. 14, 616). The ALJ noted that Claimant reported a past bipolar diagnosis but had not

11

been on medications for years. *Id.* A November 2007 record indicated Claimant was in no apparent distress. (R. 14, 612).

Regarding treatment subsequent to Dr. Eaton's April 2008 opinion, the ALJ properly noted that Claimant failed to take prescribed medications consistently and frequently cancelled or failed to show up for counseling sessions. (R. 14-15, 18-19, 570-72, 574, 576-77, 579, 607, 662). Claimant offers a misleading characterization of Dr. Eaton's October 2008 record in support of Claimant's argument that her "capabilities [n]ever changed, even as [Dr. Eaton] observed [Claimant] both on and off her medications." Pl.'s Mem. at 20. In particular, Claimant contends that Dr. Eaton, upon observing Claimant on her medications, "opined that they had not been helpful." Pl.'s Mem. at 20. However, a review of the October 2008 record indicates that Dr. Eaton simply noted Claimant's subjective statement that Claimant did not believe Lithium and Risperdal – medication prescribed in the past – was helpful. (R. 600). As explained in detail below, Claimant's contention that the ALJ failed to consider Claimant's medication noncompliance because of financial difficulties and "unbearable" side effects is not supported by the record.[3]

---

[3] The court considers briefly another contention contained within Claimant's treating physician assignment of error. In particular, Claimant states that

> were Dr. Eaton's opinion to be given controlling weight as is required, [Claimant]
> would be found disabled in accordance with Listing 12.04 for affective disorders.
> This is because Ms. Wiggins demonstrates the full range of depressive episodes and
> her symptoms result in marked impairment in her ability to maintain social
> functioning and to carry out the activities of daily living.

Pl.'s Mem. at 21 (citing [DE-66.1]). In addition to relying on Dr. Eaton's Medical Statement, which the court has found immaterial for the reasons provided later in this opinion, Claimant has not briefed this issue or presented it to the court with any supporting discussion or authority. Claimant is deemed therefore to have abandoned argument on this issue. *See e.g., Newton v. Astrue*, 559 F. Supp. 2d 662, 670-71 (E.D.N.C. 2008) (citations omitted); *March v. Comm'r of SSA*, 559 F. Supp. 2d 722, 730 n.5 (N.D. Tex. 2008)

Finally, the ALJ properly concluded that Dr. Eaton's treatment records indicated that his examinations of Claimant's mental status yielded consistently normal findings from June 2008 through November 2008. In particular, Dr. Eaton noted that Claimant presented alert, oriented, pleasant and cooperative, her thoughts were clear, concise, tightly associated and goal directed, her mood euthymic, affect pleasant, insight adequate and judgment fair. (R. 19, 598-601). When Claimant was compliant with her medication regimen, Dr. Eaton's subsequent examinations revealed similar findings. (R. 662, 665-66, 672, 692).

The absence of a sufficient rationale for the opinion of Dr. Eaton and the inconsistency between his opinion and other medical evidence in the record, including his own treatment records, reasonably downgraded the true evidentiary value of his opinion. Additionally, the ALJ complied with S.S.R. 96-2p by making his decision sufficiently specific for subsequent viewers to understand the weight accorded Dr. Eaton's opinion and the reasons for said weight. *See Koonce v. Apfel*, No. 98-1144, 166 F.3d 1209, 1999 U.S. App. LEXIS 307, at *7, 1999 WL 7864, at *2 (4th Cir. 1999) ("An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion.") (internal citations and quotations omitted). Accordingly, the ALJ was within his discretion in not giving controlling weight to Dr. Eaton's opinion.

## II.     The ALJ's severity findings are supported by substantial evidence.

Claimant contends the ALJ erred in finding Claimant's bipolar disorder and mental retardation were not severe impairments. Pl.'s Mem. at 15-16. For the reasons below, the court finds that Claimant's bipolar disorder and mental retardation were fully considered by the ALJ in his step

13

two analysis and the ALJ's analysis of both impairments is supported by substantial evidence.

A.    Bipolar Disorder

Claimant contends that the ALJ discussed her bipolar disorder "only in passing," improperly stated that Claimant's medical records "are silent on the condition from 2003 to 2008," and ignored Claimant's Global Assessment of Functioning ("GAF") scores. Pl.'s Mem. at 15. Addressing Claimant's first argument, it is evident from the court's earlier discussion that the ALJ provided a thorough summary of medical records regarding Claimant's bipolar disorder. In particular, the ALJ discussed Claimant's treatment at St. Francis Medical Center in 2002 and 2003, Wake Health in 2006 and 2007, counseling sessions at ASAP in 2008 through 2010 and treatment notes from Dr. Eaton. (R. 13-15, 18-19).

Next, Claimant correctly points out that the ALJ erred in characterizing the medical records between 2003 and 2008 as "silent" regarding bipolar disorder, noting that bipolar disorder is referenced in medical records from Wake Health. Pl.'s Mem. at 15; (R. 613-14, 616). Based on the ALJ's discussion, however, it is evident the ALJ misspoke and any error is harmless. As stated above, the ALJ specifically discussed Wake Health records. In particular, the ALJ noted that the June 2006 treatment record indicated Claimant sought treatment for migraine headaches and that she reported a past bipolar diagnosis but had not been on medications for years. (R. 14, 616). The ALJ then discussed a treatment record dated 16 August 2007, noting Zyprexa had been helpful with controlling her moods, and a 7 November 2007 treatment note indicating Claimant was in no apparent distress. (R. 14, 612-13). The court notes also that the ALJ discussed a February 2008 assessment which indicates that Claimant reported not taking mood stabilizing medications for approximately five years. (R. 14, 501).

14

Finally, as for GAF scores, "[t]he Social Security Administration has taken the stance that the GAF scale 'does not have a direct correlation to the severity requirements in [the social security] mental disorders listings.'" *Atkinson v. Astrue*, No. 5:10-CV-298-FL, 2011 U.S. Dist. LEXIS 92727, at *36, 2011 WL 3664346, at *11 (E.D.N.C. July 20, 2011), adopted, 2011 U.S. Dist. LEXIS 92682, 2011 WL 3664858 (E.D.N.C., Aug. 17, 2011) (quoting *Crockett v. Astrue*, No. 2:10-CV-64, 2011 U.S. Dist. LEXIS 60308, at *36, 2011 WL 2148815, at *11 (W.D. Va. 2011)). Nevertheless, "[a] claimant's GAF score must be considered along with all the other relevant evidence of record." *Id.* However, "the failure to reference a Global Assessment Functioning score is not, standing alone, sufficient ground to reverse a disability determination." *Love v. Astrue*, No. 3:11CV14-FDW-DSC, 2011 U.S. Dist. LEXIS 119270, at *14, 2011 WL 4899989, at *5 (W.D.N.C. Sept. 6, 2011), adopted, 2011 U.S. Dist. LEXIS 119547, 2011 WL 4899984 (W.D.N.C. Oct. 14, 2011) (citations omitted). This is particularly true when the ALJ considers the records and treatment notes upon which the GAF scores were based. *See id.*

Here, the ALJ acknowledged the GAF scores of 35 and 50 found in Dr. Lester's February 2008 assessment and an ASAP treatment record dated 5 February 2009, respectively. (R. 14-15, 510,[4] 603). In discussing Dr. Lester's record, the ALJ noted however that the GAF score was "strictly based on the claimant's history" and that Claimant had not been taking her medications.[5] (R. 14, 501, 510). In discussing the 5 February 2009 GAF score, the ALJ observed that records pre-

---

[4] Duplicates of R. 510 and R. 603 appear in R. 268 and R. 145, respectively.

[5] While the ALJ acknowledged the presence of a GAF score in the February 2008 assessment, he did not provide the score itself. *See* (R. 14) (stating "[t]he assessment of bipolar disorder with a global assessment of functioning was strictly based on the claimant's history and she was to resume medication therapy and undergo counseling").

15

and post-dating the February 5th record indicated Claimant had not been consistently attending her counseling sessions or taking her medications. (R. 576-78, 603). Claimant correctly notes that the ALJ did not explicitly reference the GAF scores of 35 and 45 found in treatment records by Ms. Perry and Petra Bowery, MA, LPC dated 26 February 2008 and 9 July 2009, respectively.[6] (R. 581, 684).[7] However, the ALJ acknowledged that Claimant's counseling sessions began in February 2008 and discussed many of the treatment records by Ms. Perry and Ms. Bowery. (R. 14, 19, 556, 565-66, 571-72, 576, 579). Thus, while the ALJ did not mention each GAF score, it is evident that he thoroughly evaluated the treatment records during this time period.

B.    Mental Retardation

Claimant contends her severe impairments also include mental retardation and relies on her alleged enrollment in special education classes, her repeating the twelfth grade, her full-scale IQ score of 61 and statements by Dr. Eaton and Ms. Bowery that Claimant is "below average" intellectually. Pl.'s Mem. at 16.

In discussing Claimant's complaints of cognitive delays, the ALJ noted that Claimant's testimony concerning her inability to make basic change and her enrollment in special education courses lacked credibility. In support of this finding, the ALJ noted the following: (1) during Claimant's initial disability interview, Claimant stated she was never enrolled in special education classes and school transcripts do not indicate enrollment in such courses (R. 218, 289-300); and (2) Claimant received satisfactory grades in her "basic math" courses and graduated from high school

---

[6] Ms. Perry served as Claimant's initial therapist; however, Ms. Bowery began seeing Claimant in December 2008 after Claimant complained that Ms. Perry had fallen asleep during their sessions. (R. 571).

[7] A duplicate of R. 581 and R. 684 appear at R. 142 and R. 285, respectively.

(R. 289-300). (R. 13). While Claimant contends the fact that she repeated twelfth grade and was enrolled during her senior year in "'Basic Skills,' 'Basic Math,' and other physical education and vocational courses [] as opposed to the usual sequential courses offered in English, Mathematics, Science and Social Studies" is evidence of a special education curriculum, *see* Pl.'s Mem. at 16, this court finds such a conclusion is not self-evident. The transcripts provide no indication that the courses taken by Claimant were designed for mentally-impaired students and thus finds the ALJ's observation that Claimant's school transcripts do not indicate any special education classes supported by substantial evidence.

As for treatment records by Dr. Eaton and Ms. Bowery indicating that Claimant operates at a level below average intellectual functioning – records evaluated by the ALJ – such evidence may be indicative of some limitation in function. Indeed, in discussing Claimant's intellectual functioning the ALJ acknowledged Claimant's full-scale IQ score of 61. (R. 13, 148[8]). However, the ALJ found this score inconsistent with Claimant's scores on the Broad Math and Broad Written Language portions of the WJ-III achievement test as well as her academic performance in high school. While Claimant contends the ALJ improperly weighed the evidence before him, the court's duty is limited to determining whether the substantial evidence supports the ALJ's conclusions. The court is not to reweigh conflicting evidence. *See Mastro*, 270 F.3d at 176 (citation omitted).

The ALJ's decision indicates Claimant's bipolar disorder and cognitive limitations were properly considered at step two of the evaluation process. Furthermore, the ALJ considered Claimant's mental impairments during the remaining steps of the sequential process and, as explained below, properly assessed an RFC that accounted for the nonexertional limitations imposed

---

[8] A duplicate of R. 148 appears at R. 632.

by Claimant's bipolar disorder and cognitive delays. *See Gabriele v. Astrue*, No. 7:10-CV-24-D, 2011 U.S. Dist. LEXIS 43980, at \*40, 2011 WL 1542090, at \*14 (E.D.N.C. Mar. 14, 2011), adopted, 2011 U.S. Dist. LEXIS 43922, 2011 WL 1541292 (E.D.N.C. Apr. 22, 2011) (noting "[e]ven though the ALJ did not include Lyme disease or chronic fatigue syndrome as severe impairments at step two, the ALJ considered the other relevant symptoms related to these disorders and their effect on [p]laintiff's ability to do work-related activities in determining the [p]laintiff's RFC"). Accordingly, Claimant's argument is without merit.

## III. The ALJ's finding that Claimant's impairment did not meet or equal Listing 12.05 is supported by substantial evidence.

Claimant argues that the ALJ erred by finding that his impairment does not meet or equal Listing 12.05, the listing for mental retardation. Pl.'s Mem. at 17.

Claimant bears the burden of demonstrating that her impairments meet or equal a listed impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). Listing 12.05 sets forth a two-part inquiry for determining whether a claimant meets the requirements for mental retardation. *Shoulars v. Astrue*, 671 F. Supp. 2d 801 (E.D.N.C. 2009) (citing *Norris v. Astrue*, No. 7:07-CV-184-FL, 2008 U.S. Dist. LEXIS 92635, at \*5, 2008 WL 4911794, at \*3 (E.D.N.C. Nov. 14, 2008)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. First, a claimant must satisfy the diagnostic description of mental retardation, which requires a showing of "(1) significantly subaverage general intellectual functioning[9] (2) with deficits in adaptive

---

[9] The phrase "significantly subaverage general intellectual functioning" appears also in the definition of mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), which the DSM-IV defines as "an IQ of about 70 or below." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 39 (4th ed. 1994).

functioning[10] (3) initially manifested during the developmental period; i.e. . . . before age 22."

*Shoulars*, 671 F. Supp. 2d at 814 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05). Upon

making this showing, the claimant must then meet the required severity level of this disorder, which

is accomplished by satisfying any one of four categories labeled (A)-(D) under § 12.05. *Id.*

Claimant contends that she satisfies the mental retardation listing under category C ("Listing

12.05C"), which requires (1) a valid verbal, performance or full scale IQ of 60 through 70; and (2)

another impairment, physical or mental, that imposes, an additional and significant work-related

limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

While it is undisputed that Claimant satisfies the "C" criteria,[11] the issue is whether Claimant

[10] Listing 12.05 does not define "adaptive functioning." Regulations promulgated by the SSA provide that "[t]he definition of [mental retardation] . . . in [the] listings is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (April 24, 2002). Given "the SSA declined to adopt any one of [these] specific definitions, . . . the introductory paragraph of Listing 12.05 can be met if the individual is found to have, *inter alia*, deficits in adaptive functioning as defined by any of the [leading] professional organizations." *Durden v. Astrue*, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008).

[11] As acknowledged by the ALJ, Claimant scored a full scale IQ of 61 on the Weschsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") test, administered by Grace R Stroud, M.A., in July 2009. (R. 15, 17, 631). Defendant suggests that the ALJ rejected Dr. Stroud's IQ finding; however, the ALJ's decision does not reflect this position. Def.'s Mem. Supp. Mot. J. Pleadings at 27 ("Def.'s Mem."). Rather, it is the court's position that the ALJ impliedly acknowledged that Claimant met the "C" criteria as the ALJ specifically acknowledged Ms. Stroud's finding that Claimant "put forth a good effort and the scores were valid." (R. 13). However, based on other evidence in the record, the ALJ found the record did not support deficits in adaptive functioning. *See* (R.17) (discussing Claimant's education, work and family background, and finding such "adaptive functioning is such as to vitiate against meeting a 12.05 listing.")

Moreover, the ALJ found at step two that Claimant suffered from severe impairments which significantly limited her ability to perform basic work related functions. (R. 13); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A (explaining the "work-related limitation of function" requirement is satisfied when the claimant is determined to have a severe impairment at step two of the evaluation process) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *see also Luckey v. Dept. of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989) (explaining the second prong of Listing 12.05C is established by a finding that a claimant suffers from a "severe combination of impairments").

satisfies the first step (i.e., diagnostic definition) of the mental retardation listing analysis. *See Smith v. Barnhart*, No. 6:04-CV-34, 2005 U.S. Dist. LEXIS 5975, at *10, 2005 WL 823751, at *4 (W.D. Va. Apr. 8, 2005) (explaining "mental retardation is a life-long, and not acquired, disability[;] [t]hus, to qualify as disabled under this listing, a [claimant] must first demonstrate that he has had deficits in adaptive functioning that began during childhood"); *Justice v. Barnhart*, 431 F. Supp. 2d 617, 619 (W.D. Va. 2006) ("[E]ven if the record clearly establishes that [a claimant] meets the [severity] requirements of [Listing 12.05C], a finding of mental retardation cannot be warranted without a finding that [claimant] manifested deficits in adaptive functioning before age 22.") (citing *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)). Under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), to be deemed mentally retarded one must have "significant limitations in adaptive functioning in *at least two* of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (emphasis added) (citing AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000)).

The ALJ acknowledged at step three of the evaluation process that Claimant had a diagnosis of borderline intellectual functioning based on a July 2009 examination by Grace Stroud, M.A. (R. 17, 146-49).[12] However, the ALJ found that Claimant had not established that her borderline

---

Additionally, the ALJ concluded at step four that Claimant was unable to perform her past relevant work. (R. 19); *see Flowers v. U.S. Dep't Health & Human Servs.*, 904 F.2d 211, 214 (4th Cir. 1990) ("In this circuit, we follow the rule that if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of § [12.05C]").

[12] A duplicate of Ms. Stroud's evaluation appears at R. 630-33.

intellectual functioning constituted an impairment that would meet or equal a listing. (R. 17). In so doing, the ALJ specifically considered Listing 12.05C, and concluded that Claimant's adaptive functioning – including her graduation from high school, her work history and her ability to read the newspaper and romance novels, to manage her finances, to use the computer and to raise her children – "is such as to vitiate against meeting a 12.05 listing." (R. 17); *see Hatfield v. Astrue*, No. 5:07-00267, 2008 U.S. Dist. LEXIS 75277, at \*36-37, 2008 WL 4449948, at \*12 (S.D. W. Va. Sept. 29, 2008) (explaining claimant failed to demonstrate deficits in adaptive functioning because, *inter alia*, he was not enrolled in special education classes in school, was able to read and write and managed his own finances). Claimant contends she satisfies the diagnostic definition of Listing 12.05C as she suffers from deficits in adaptive functioning in the areas of functional academic skills, work, communication, home living and social/interpersonal skills which manifested prior to age 22. *See* Pl.'s Mem. at 18-19.

Regarding the area of academic skills, Claimant contends her high school transcripts demonstrate "some sort of special education" as she was enrolled in the twelfth grade twice and "[d]uring her senior year, [Claimant] took classes such as "Basic Skills," "Basic Math," and other physical education and vocational courses [] as opposed to the usual sequential courses offered in English, Mathematics, Science and Social Studies." Pl.'s Mem. at 16. Claimant argues further that other evidence in the record reflects "a history of special education," including assessments by Dr. Eaton and Ms. Bowery that Claimant is "below average" intellectually (R. 600-01, 681),[13] a 7 November 2000 treatment record from St. Francis Medical Center noting Claimant's ability to perform simple calculations was poor (R. 137) and her testimony that she cannot make change. Pl.'s

---

[13] Duplicates of R. 601 and R. 681 appear at R. 144 and R. 282, respectively.

Mem. at 16. As explained in detail above, however, the court finds the ALJ's consideration of Claimant's cognitive impairments supported by substantial evidence. Moreover, her transcripts and graduation from high school negate a finding that Claimant had a deficit in the area of functional academic skills. *Cf. Rivers v. Astrue*, 8:10-CV-00314-RMG, 2011 U.S. Dist. LEXIS 70314, *10-11 (D.S.C. June 28, 2011) (noting the record was replete with evidence that claimant had a deficit in the area of functional academic skills, including his classification as a special needs student, observations by teachers that claimant suffered from a speech defect, receiving a "D" in "general math," and dropping out of school in the ninth grade).

With respect to the area of work, Claimant relies on her inconsistent work history, and in particular, the fact she has never "held any job for longer than about a year" and has been fired on numerous occasions. Pl.'s Mem. 18; *see Edwards v. Comm'r of Soc. Sec.*, No. 1:07-CV-848, 2008 U.S. Dist. LEXIS 108485, at *18-19, 2008 WL 4425587, at *8 (W.D. Mich. Sept. 9, 2008) (relying in part on claimant's inconsistent work history as evidence of a deficit in adaptive functioning). The ALJ, in finding Claimant did not lack deficits in adaptive functioning, relied in part on the fact that Claimant had "work[ed] many years at significant gainful activity." (R. 17). Regardless of the conflicting descriptions of Claimant's work history offered by the ALJ and Claimant, the ALJ nevertheless erred in relying on Claimant's previous work history to prove non-disability given the section 12.05C criteria have been met. *See Etheredge v. Astrue*, No. 4:08-3167-SB-TER, 2010 U.S. Dist. LEXIS 18557, at *33-34, 2010 WL 758066, *11 (D.S.C. Feb. 18, 2010) (holding the ALJ's finding that claimant's "work history indicate[d] higher overall intellectual functioning . . . violate[d] [the] prohibition against relying on the claimant's previous work history to prove non-disability where the Section 12.05(C) criteria are met") (citing *Luckey*, 890 F.2d at 669). The court finds this

22

error harmless, however, as Claimant fails in carrying her burden of identifying any other functional areas in which she suffered adaptive deficiencies prior to age twenty-two. While Claimant contends she suffers from deficiencies in "communication, daily living skills and socialization," Claimant cites only Dr. Stroud's July 2009 psychological evaluation wherein it was noted that Claimant's adaptive levels in these three areas "reflect severe to moderate difficulties." (R. 148). Dr. Stroud's evaluation, however, does not indicate that such deficiencies manifested themselves before the age of 22.

Based on the foregoing, the court finds that the ALJ's decision that Claimant's impairments were not severe enough to meet or medically equal Listing 12.05C supported by substantial evidence.

## IV. The ALJ properly assessed Claimant's credibility.

Claimant contends the ALJ failed to properly assess Claimant's credibility. Pl.'s Mem. at 13. Federal regulations 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology. *See Craig*, 76 F.3d at 593. Under these regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, as an objective matter, the ALJ must determine whether Claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Id.*; *see also* S.S.R. 96-7p, 1996 SSR LEXIS 4, at *5, 1996 WL 374186, at *2. If this threshold question is satisfied, then the ALJ evaluates the actual intensity and persistence of the pain or other symptoms, and the extent to which each affects a claimant's ability to work. *Id.* at 595. The step two inquiry considers "all available evidence," including objective medical evidence (i.e., medical signs and laboratory findings), medical history, a claimant's daily activities, the location, duration, frequency and intensity of symptoms, precipitating and aggravating factors, type, dosage, effectiveness and adverse side effects of any pain medication, treatment, other

23

than medication, for relief of pain or other symptoms and functional restrictions. *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3); S.S.R. 96-7p, 1996 SSR LEXIS 4, at *6, 1996 WL 374186, at *3. The ALJ may not discredit a claimant solely because her subjective complaints are not substantiated by objective medical evidence. *See id.* at 595-96. However, neither is the ALJ obligated to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." S.S.R. 96-7p, 1996 SSR LEXIS 4, at *6, 1996 WL 374186, at *3.

Here, the ALJ's decision indicates he considered Claimant's numerous subjective complaints associated with her impairments, including vision difficulties, cognitive delays, lower back pain due to scoliosis, auditory hallucinations and headaches. (R. 13-14, 18). The ALJ found that Claimant had medically determinable impairments reasonably capable of causing Claimant's subjective symptoms but concluded Claimant's subjective complaints were not fully credible. *Id.* In reaching this conclusion, the ALJ noted the following: (1) Claimant's scoliosis "was only noticed and remarked on in conjunction with chest x-rays for chest colds" with no interval change from x-rays performed in 1996, no physician thought it necessary to order lumbar spine x-rays and no functional limitations were revealed upon examination (R. 337, 449, 466, 647); (2) Claimant's headache pain was at times attributed to sinus problems; (3) Claimant's complaints of poor vision "were always in conjunction with not having glasses" but with the correct prescription, Claimant enjoyed reading and using a computer (R. 702-03); (4) Claimant's complaints of disabling cognitive limitations and attendance in special education courses were unsupported by her high school transcripts, her disability application, her generally normal mental status examinations and her ability to take care of her children, "at least one of whom is autistic." (R. 13, 16, 18, 218, 298-99, 598-601, 662, 665-66,

24

672, 692). The ALJ also noted Claimant's failure to comply with mental health treatment and as well as her medication noncompliance and observed that "[p]rior evidence established the claimant able to work with medication . . . " (R. 15, 18-19). Claimant faults the ALJ's analysis, contending he either ignored evidence or improperly considered it.

First, Claimant contends the ALJ improperly relied on evidence indicating Claimant was capable of working when taking her medications. Pl.'s Mem. at 13. In particular, Claimant contends that "even while attempting to work, [she] found it very difficult to hold a job, rarely surviving on the job for more than two months and never longer than a year because of the limiting effects of her mental conditions." *Id.* Claimant essentially asks the court to reweigh the evidence. The ALJ properly observed that in an August 2002 treatment record, the physician noted that Claimant, who was on medication at the time, was employed as a security guard. (R. 13, 434). Moreover, in Dr. Lester's February 2008 assessment, which was considered by the ALJ, it was noted that Claimant was capable of maintaining a job "when on meds." (R. 504). As such, the ALJ properly observed that when on medication, Claimant was capable of working.

Second, Claimant contends the ALJ ignored evidence that her impairments remained disabling even when she took her medications, citing the following in support of her contention: (1) Dr. Eaton's alleged statements that Claimant's "previous medications had not [sic] very helpful in alleviating her symptoms" and "even after trying several different medication combinations, he had been unable to find a combination that had a sustained response to [Claimant's] symptoms" found in treatment records dated 8 October 2008 and 7 November 2008, respectively; (2) a 15 April 2009 treatment note by Ms. Bowery indicating that Claimant's "depressive episodes were increasing in

25

intensity;"[14] and (3) a 25 March 2009 treatment record by John Tanner, M.D., Claimant's primary care physician, indicating Claimant's back pain "was no longer controlled with her medications." Pl.'s Mem. at 14. Regarding Dr. Eaton's October and November 2008 records, the court agrees with Defendant that Claimant's has mischaracterized Dr. Eaton's statements contained therein. As discussed previously, the October 2008 record simply contains Dr. Eaton's recordation of Claimant's subjective statement that she did not believe Lithium and Risperdal – medication prescribed in the past – was helpful. (R. 600). As for the November 2008 record, the ALJ acknowledged Dr. Eaton's statement that Claimant reported "tr[ying] [] several different medication combinations with very little sustained response" (R. 601); however, the ALJ discounted it because Claimant was not consistently taking her medications at that time. (R. 19). As the court discussed previously, this finding is supported by substantial evidence.

Claimant's reliance on Ms. Bowery's April 2009 progress report is also unpersuasive as Claimant ignores the remainder of the report wherein Ms. Bowery specifically warned Claimant that she would be discharged from treatment if she misses another three appointments without notice and notes Claimant's statement that she is "ready to take her medications consistently." (R. 667). A fair review of Ms. Bowery's progress report supports the ALJ's finding that Claimant did not attend therapy sessions on a consistent basis and was noncompliant with her medication regimen. While Claimant correctly notes that the ALJ did not discuss Dr. Tanner's March 2009 report, which indicates Claimant's back pain was affecting her activity level, the ALJ specifically acknowledged Dr. Tanner's September and October 2009 treatment records which indicated Claimant's back pain

---

[14] Claimant incorrectly identifies the date of the treatment note at issue as 27 May 2009. The only record found by the court dated 27 May 2009 is a treatment note by Dr. Eaton which indicates Claimant was doing well on her medications and her mood was euthymic. (R. 672).

had no impact on her activity level. (R. 645, 647). Furthermore, as observed by the ALJ, Dr. Tanner noted in the October 2009 report that Robaxin "helped" Claimant's back pain. (R. 15, 647).

Third, Claimant contends the ALJ "failed to properly consider that [Claimant] often lacked the funds to purchase her medications and that she sometimes did not take them due to unbearable side effects as mitigating factors when assessing her credibility." Pl.'s Mem. at 14-15. An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to . . . pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits . . . ." S.S.R. 96-7p, 1996 SSR LEXIS 4, at *23, 1996 WL 374186, at *8. Acceptable reasons for medication noncompliance include the inability to tolerate side effects associated therewith and a claimant's inability to afford treatment. *Id.*; *see also Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (holding it was improper to consider a disability claimant's failure to seek treatment in determining whether an impairment was severe when the failure was justified by lack of funds).

Regarding her inability to afford her medication, Claimant cites the following: (1) treatment records from Ms. Perry dated 19 March 2008 and 26 March 2008 indicating Claimant's phone had been disconnected and that Claimant had voiced doubt of making her electricity and rent payments (R. 554-55); (2) a treatment note from Ms. Bowery dated 5 February 2009 with the notation "[f]inancial problems" appearing beside Axis IV of the DSM diagnostic system (R. 603); and (3) three treatment records from Dr. Tanner dated 25 February 2008, 28 May 2008 and 16 September 2009, indicating Claimant was "on Medicaid but unable to afford Synthroid," out of Synthroid (with no explanation as to why) and was "out of [hypothyroidism medication for three months] due to

27

finances," respectively. (R. 610, 622, 645).

Despite these records, however, the overwhelming weight of the record shows that Claimant had considerable access to both medical treatment and medication. *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (explaining no error by ALJ in finding claimant not credible despite claim of inability to afford medical treatment where claimant was found to have access to medical attention and little difficulty in obtaining medication); *see also Wooten v. Shalala*, 998 F.2d 1012 (table), 1993 U.S. App. LEXIS 18071, at \*9-11, 1993 WL 269267, at \*4 (4th Cir. Jul. 16, 1993) (explaining the ALJ did not penalize claimant for the alleged inability to afford medication where it was not clear from the record that claimant could not afford medical treatment). Over the course of the relevant time period, Claimant received treatment from Ms. Perry and Ms. Bowery, her ASAP therapists, on at least forty occasions (R. 550-79, 607-08, 667-99), Dr. Eaton, her psychiatrist (R. 597-602, 662, 665-66, 672, 692), and Dr. Tanner, her primary care physician (R. 640-48). Furthermore, Claimant's medical records reveal that during many of her medical visits, she was prescribed medication and/or chided for her medication noncompliance without reference to Claimant's alleged financial constraints. *See e.g.*, (R. 574, 607, 662, 667, 670, 675, 697); *cf. Lovelace v. Bowen*, 813 F.2d 55, 57 (5th Cir. 1987) (claimant's treating physician noted claimant was financially unable to buy medication); *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) (claimant's treating physician noted claimant had "dire financial troubles").

Claimant's argument regarding medication side effects fares no better. Claimant contends her "fears over side effects and complications from her medications seem to be well-founded, given that a previously prescribed medication, lithium, damaged her thyroid to the point that she now requires treatment for that condition." Pl.'s Mem. at 15. In further support of this contention,

28

Claimant cites progress notes by Ms. Perry, Ms. Bowery and Dr. Eaton which contain summaries of Claimant's subjective complaints regarding medication side effects. *See e.g.*, (R. 552) (March 2008 note by Ms. Perry noting Claimant's attributed lack of sleep to medication); (R. 599) (August 2008 progress report by Dr. Eaton noting that Claimant had not "taken any psychotropic medication for several weeks to months [and] gives no clear reason as to why she discontinued the medication apart from what she calls 'side effects'"); (R. 571-72) (December 2008 progress report by Ms. Bowery noting Claimant's complaint that her medications "make [her] irritable, jumpy, restless and give [her] heart palpatations" and that Claimant refuses to take medications until she could "discuss the negative side effects she was experiencing" with her psychiatrist).

However, consideration of the record in totality does not support Claimant's rationale for her medication noncompliance. Indeed, despite Claimant's alleged fear of side effects, Dr. Eaton's records indicate Claimant was prescribed medication on a consistent basis and did not express concern as to medication side effects. (R. 600-02, 662, 665-66, 672, 692); *see also* (R. 566) (August 2008 report by Ms. Perry who noted that Claimant "informed therapist about the physical symptoms she's experiencing [and that Claimant] believe[d] that these symptoms are related to not being on her medications. [Claimant] identified Buspart and Lithium as medications with minimal side effects" (emphasis added)). Similarly, Dr. Tanner's progress notes, which indicate the prescription of medication for Claimant's back pain, do not support Claimant's contention that she was unable to take her medications as prescribed due to unbearable side effects.[15] (R. 640, 644, 646-47). Finally,

---

[15] A 16 September 2009 progress report by Dr. Tanner indicates that one of Claimant's medications was discontinued due to complaints of drowsiness. (R. 646). However, the progress report indicates further that Claimant was started on a substitute medication and a subsequent record indicated Claimant's back pain was responding positively to medication. (R. 647).

29

the court observes that in January 2009, Ms. Bowery noted that Claimant agreed to discuss her medication concerns with Dr. Eaton, including "her concerns about medication, the side effects, how she was supposed to feel and what they were supposed to do." (R. 574). However, Dr. Eaton's progress reports indicate no such discussion and as noted above, in a February 2009 report, Dr. Eaton "strongly advised" Claimant to adhere to her medication regimen, which belies Claimant's side effect concerns. (R. 662). Accordingly, the court finds that the ALJ properly considered the treatment Claimant sought and received in determining the weight to accord Claimant's allegations of pain and other symptoms.

It is within the ALJ's province to determine credibility and, in fulfilling that function, the ALJ is entitled to consider inconsistencies between a claimant's testimony and the evidence of record. *See Mickles*, 29 F.3d at 929 ("Subject only to the substantial evidence requirement, it is the province of the [ALJ], and not the courts, to make credibility determinations."). To the extent that the ALJ detailed the relevant facts underlying his finding that Claimant's testimony was not fully credible, his credibility finding is entitled to substantial deference. *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (an ALJ's observations regarding credibility should be given great weight). Here, the ALJ comported fully with the credibility evaluation prescribed by Social Security Ruling 96-7p by making findings, supported by reasons, with respect to Claimant's alleged symptoms, the medical record and Claimant's own testimony. While Claimant may disagree with the manner in which the ALJ took account of this evidence, this court cannot re-weigh the evidence. *See Mastro*, 270 F.3d at 176. For the foregoing reasons, Claimant's argument as to this issue is without merit.

## V.    The ALJ's RFC finding is supported by substantial evidence.

Claimant contends the ALJ's RFC finding is not supported by substantial evidence. Pl.'s Mem. at 13.

An individual's RFC is defined as that capacity which an individual possesses despite the limitations caused by his physical or mental impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* S.S.R. 96-8p, 1996 SSR LEXIS 5, at *5, 1996 WL 374184, at *1. The RFC assessment is based on all the relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* S.S.R. 96-8p, 1996 SSR LEXIS 5, at *14, 1996 WL 374184, at *5. When a claimant has a number of impairments, including those deemed not severe, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (citations omitted) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments."). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 SSR LEXIS 5, at *21, 1996 WL 374184, at *7.

The ALJ's decision indicates that he considered Claimant's mental and physical impairments in totality before determining Claimant maintained the RFC to perform a full range of unskilled work at all exertional levels. As described earlier, the ALJ's opinion provides a detailed review of Claimant's medical records, citing medical facts and underlying evidence as to each impairment. In addition, the RFC assessment takes account of Claimant's testimony concerning pain and other

31

symptoms to the extent that this testimony proved consistent with the objective medical evidence before the ALJ. *See Hines v. Barnhart*, 453 F.3d 559, 565 n.3 (4th Cir. 2006) (noting the ALJ need not accept Claimant's subjective evidence to the extent it is inconsistent with the available evidence). Also, the ALJ's review of Claimant's medical impairments includes consideration of Dr. Eaton's April 2008 letter. Claimant contends the RFC finding is not supported by substantial evidence based on an erroneous evaluation of the medical records, the treating physician's opinion and Claimant's credibility. However, as explained above, the court finds the ALJ's consideration of the medical records, Dr. Eaton's letter and Claimant's credibility was proper.

## VI. This case should not be remanded under sentence six of 42 U.S.C. § 405(g) for consideration of additional evidence.

Finally, in support of her argument that Dr. Eaton's April 2008 opinion was entitled to controlling weight, Claimant relies on a Medical Statement by Dr. Eaton dated 8 February 2011, which was not presented to the ALJ or the Appeals Council. *See* Pl.'s Mem. at 20 (citing [DE-66.1]). However, Claimant fails to request that this case be remanded pursuant to sentence six for consideration of the Medical Statement, and in fact, provides no argument in support of a sentence six remand. For the reasons provided below, Claimant has not established that the case should be remanded to the Commissioner under sentence six.

When a claimant submits evidence that has not been presented to the ALJ, the court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand under 42 U.S.C. § 405(g). In a sentence-six remand, the court does not rule on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time

32

of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.* Under sentence-six, "[t]he court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is <u>new</u> evidence which is <u>material</u> and that there is <u>good cause</u> for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (emphasis added); *see also Nuckles v. Astrue*, No. 7:09-CV-13-FL, 2009 U.S. Dist. LEXIS 93520, at *12, 2009 WL 3208685, at *4 (E.D.N.C. 5 Oct. 2009) (explaining a sentence six remand requires the evidence be new and material and there must be good cause for failing to submit the evidence earlier).

Evidence is new if it is not duplicative or cumulative of that which is already contained in the record. *Wilkins v. Sec'y, Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citations omitted). Evidence is material if it relates to the period on or before the date of the ALJ's decision, 20 C.F.R. §§ 404.970(b), 416.1470(b), and there is a "reasonable possibility that the new evidence would have changed the outcome" of the case. *Wilkins*, 953 F.2d at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)). In this case, the relevant time period extends from 1 August 2003 (Claimant's alleged disability onset date) to 23 March 2010 (the date of the ALJ's decision). (R. 10, 21). Finally, as for good cause, the courts have recognized that in crafting the statute governing remand, it was Congress's intent to permit remand pursuant to sentence six on a very limited basis. *See Rogers v. Barnhart*, 204 F. Supp. 2d 885, 892 (W.D.N.C. 2002) ("'Congress made it unmistakably clear' that it intended to limit remands for 'new evidence.'") (quoting *Melkonyan*, 501 U.S. at 99-100)). Moreover, Claimant bears the burden in proving that the good cause and other requirements of sentence six are met. *Rogers*, 204 F. Supp. 2d at 892.

33

In the Medical Statement, which is simply a form opinion, Dr. Eaton states that Claimant suffers from numerous symptoms associated with her mental impairment, including anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, difficulty concentrating or thinking, generalized persistent anxiety and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. [DE-66.1]. Dr. Eaton indicates as a result of Claimant's psychiatric condition, she suffers from moderate to marked restriction of activities of daily living, marked to extreme difficulty in maintaining social functioning, experiences deficiencies of concentration, persistence or pace impairing her ability to complete tasks in a timely fashion and has repeated episodes of deterioration or decompensation in work or work-like settings. *Id.* The questionnaire also includes a list of work limitations related to Claimant's psychiatric state, including the ability to understand and remember simple instructions, to maintain attention and concentration, to work with others and to accept instructions and respond appropriately to criticism from supervisors, and indicates Claimant is generally either markedly or extremely impaired. *Id.*

The Medical Statement is not "new evidence" under sentence six as the information therein relates to a time almost one year after the ALJ's decision and no information is contained within this evaluation relating Dr. Eaton's findings to Claimant's condition during the relevant time period. *See Edwards v. Astrue*, No. 7:07-CV-48, 2008 U.S. Dist. LEXIS 13625, at *25, 2008 WL 474128, at *9 (W.D. Va. Feb. 20, 2008) ("The [additional records] do not relate back to the relevant time period as they were . . . [completed] over 6 months after the ALJ rendered his decision."). Moreover, even if the recently filed evidence was considered new evidence, there is no reasonable probability that it would have changed the outcome of the ALJ's determination, and therefore, the evidence is immaterial. The work limitations checklist contained in the Medical Statement is identical to that

34

found in the medical source statement completed by Ms. Bowery on 17 December 2009 and considered at length by the ALJ. Dr. Eaton's responses are either cumulative of those provided by Ms. Bowery or indicate a deterioration in Claimant's work limitations. *See Wilmer v. Astrue*, No. 6:07-CV-2, 2008 U.S. Dist. LEXIS 1664, at *16-17, 2008 WL 112045, at *6 (W.D. Va. Jan. 8, 2008) (stating if claimant "is of the view that he is now disabled based on deterioration after the ALJ's . . . decision . . . , his remedy is to file a new application under the regulations applicable for such applications") (citing 20 C.F.R. §§ 404.620(a)(2), 416.330(b)).

Finally, even if the court was to find that the Medical Statement is both new and material, Claimant waited until after the Appeals Council denied her request for review to obtain additional evidence concerning her mental impairment. (R. 1-5); [DE-66.1]. Claimant has failed to demonstrate a valid reason for her failure to introduce the evidence during the administrative proceedings. Claimant's substantial delay in seeking this evaluation weighs against a finding of good cause. *See Miracle v. Astrue*, No. 08-65-JBC, 2009 U.S. Dist. LEXIS 23061, at *9, 2009 WL 774098, at *3 (E.D. Ky. Mar. 20, 2009) (finding remand to consider report indicating claimant met the requirements of Listing 12.05(C) unwarranted as claimant "had ample opportunity to obtain probative evidence of a purported mental impairment prior to the ALJ hearing, but did not do so") (quoting *Winters v. Comm'r of Soc. Sec.*, No. 98-1991, 2000 U.S. App. LEXIS 11816, 2000 WL 712353, at *2 (6th Cir. May 22, 2000)).

## CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-65] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-72] be GRANTED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 2nd day of February, 2012.

Robert B. Jones, Jr.
United States Magistrate Judge